IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| CHARLES A. JOHNSON, et al. | * | |
| Plaintiffs | * | |
| v. | * | Civil Case no.: WDQ 12-CV-2312 |
| FREDERICK MEMORIAL HOSPITAL, INC., et al. | * | |
| | * | |
| Defendants | | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT FREDERICK MEMORIAL HOSPITAL, INC.'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant, Frederick Memorial Hospital, Inc., by undersigned counsel, hereby moves to dismiss the Complaint pursuant to Fed. Civ. P. 12(b)(6) or, in the alternative, moves for summary judgment pursuant to Fed. R. Civ. P. 56 as to Count IV.  The grounds in support of this motion are more fully set forth in the attached memorandum of law.

                                                       */s/*
                                       J. Michael Sloneker (Bar No. 03324)
                                       Ryan K. Bautz (Bar No. 27888)
                                       ANDERSON, COE & KING, LLP
                                       Seven Saint Paul Street, Suite 1600
                                       Baltimore, Maryland 21202
                                       T:  410-752-1630
                                       F:  410-752-0085
                                       sloneker@acklaw.com
                                       bautz@acklaw.com
                                       *Attorney for Defendant Frederick Memorial Hospital, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Northern Division

| | | |
|---|---|---|
| CHARLES A. JOHNSON, et al. | * | |
| Plaintiffs | * | |
| v. | * | Civil Case no.: WDQ 12-CV-2312 |
| FREDERICK MEMORIAL HOSPITAL, INC., et al. | * | |
| | * | |
| Defendants | | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT FREDERICK MEMORIAL HOPSITAL, INC.'S MOTION TO DISMISS
OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

Defendant, Frederick Memorial Hospital, Inc., by and through undersigned counsel, respectfully submits this memorandum of law in support of its motion to dismiss or, in the alternative, for summary judgment, and states:

**I.     INTRODUCTION**

Plaintiffs have filed a four count complaint against Defendants Frederick Memorial Hospital, Inc. (hereinafter "FMH"), Ravi Yalamanchili, M.D., Ravi Yalamanchili, M.D., P.A., Boyd A. Dwyer, M.D., and Mid Maryland Neurology, P.A. concerning medical care and treatment that Plaintiff Charles A. Johnson received from July 15, 2011 through September 27, 2011 following his initial presentation to FMH's emergency department on July 15 with complaints of "sudden-onset back pain," "bilateral leg numbness" and "right leg spasms." Plaintiffs contend that defendants failed to correctly and timely determine that Mr. Johnson was suffering from a

progressive, thoracic spinal emergency and that the delay in a proper diagnosis and treatment left him with permanent lower extremity paralysis.

The sole basis for federal jurisdiction in this case is Plaintiffs' claim in Count IV against FMH for alleged violations of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA").  EMTALA, however, was enacted to combat "patient dumping" and was "'not intended to duplicate preexisting legal protections, but rather to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat.'" Vickers v. Nash General Hosp., Inc., 78 F.3d 139, 142 (4th Cir. 1996) (quoting Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991)).  The Act "does not provide a cause of action for routine charges of misdiagnosis or malpractice," and the "circuit courts are universally in accord on the need to distinguish EMTALA claims from standard claims of negligence and misdiagnosis." Id. at 142-143.

At best the Complaint alleges nothing more than a standard medical negligence claim arising under Maryland law concerning defendants' alleged failure to correctly and timely diagnose Mr. Johnson's thoracic spinal condition.  Plaintiffs have failed to allege any facts showing that Mr. Johnson received disparate treatment or that FMH's emergency department had not stabilized Mr. Johnson's emergency medical condition within the meaning of EMTALA at the time of his admission to FMH for inpatient care and treatment.  Indeed, no such facts could be alleged given that Mr. Johnson's emergency room records establish that he was screened, determined to be suffering from an emergency medical condition, stabilized within the meaning of EMTALA, and admitted for inpatient care and treatment at FMH for more than two days.

Plaintiffs have not alleged, nor is this actually, a case of patient dumping. Federal jurisdiction cannot be sustained merely by clothing conventional allegations concerning misdiagnosis and improper treatment with conclusory assertions that an individual was not provided an adequate medical screening or was not stabilized within the narrow meaning of those terms under EMTALA. For these reasons and, as more fully explained below, FMH respectfully asks this Court to dismiss the Complaint for failing to state a claim upon which relief can be granted, or, in the alternative, to enter summary judgment in Defendant FMH's favor as to Count IV.

## II.    LEGAL STANDARDS

### A. Motion to Dismiss.

A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint. See Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999); Dist. 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp., 609 F.2d 1083, 1085-86 (4th Cir. 1979); Quest Comm'ns Corp. v. Md.-Nat'l Capital Park & Planning Comm'n, 553 F. Supp. 2d 572, 574 (D. Md. 2008). Thus, for purposes of a motion to dismiss, a court takes as true the well-pleaded allegations of the complaint. Byrd v. Gate Petroleum Co., 845 F.2d 86, 87 (4th Cir. 1988); see Dist. 28, United Mine Workers of Am., Inc., 609 F.2d at 1085; Quest, 553 F. Supp. 2d at 574.

A court need not, however, accept the truth of inferences or conclusions unsupported by allegations of specific facts. Young v. City of Mount Rainier, 238 F.3d 567, 577 (4th Cir. 2001); see Randall v. United States, 30 F.3d 518, 522 (4th Cir. 1994); Quest, 553 F. Supp. 2d at 574. Nor need a court accept the truth of legal conclusions in the guise of factual allegations. See Dist.

28, United Mine Workers of Am., Inc., 609 F.2d at 1085-86.  Indeed, "[w]ere it otherwise, Rule 12(b)(6) would serve no function." Id.

The unique function of Rule 12(b)(6) is to "authorize[] a court to dismiss a claim on the basis of a dispositive issue of law." Neitzke v. Williams, 490 U.S. 319, 326 (1989).  In that way, Rule 12 "streamlines litigation by dispensing with needless discovery and factfinding." Id. at 326-327.

The Supreme Court has recently stated that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations … a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007) (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, *see* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) … ('[T]he pleading must contain something more … than … a statement of facts that merely creates a suspicion [of] a legally cognizable right of action'), on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. (footnote omitted).

Finally, it is no longer true that a court should refrain from dismissing a complaint unless it "appears beyond doubt" that the plaintiff can prove "no set of facts" that would entitle him to relief. Bell Atl. Corp., 127 S. Ct. at 1969 (abrogating Conley v. Gibson, 355 U.S. 41 (1957)).  To the contrary, a complaint must now contain "enough facts to state a claim to relief that is plausible on its face." Id. at 1974; see id. at 1965 (stating that the complaint must contain "enough factual matter (taken as true) to suggest" that the plaintiff has "plausible grounds" for a

claim; id. at 1966 (stating that the complaint must show a "plausible entitlement to relief"); Quest, 553 F. Supp. 2d at 574.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" Id. at 1950.

    **B.**    **Motion for Summary Judgment.**

If a Court considers materials outside the pleadings when considering a motion to dismiss under Rule 12(b)(6), it may appropriately treat the motion as a motion for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). Summary judgment is appropriate against a plaintiff who fails to make a showing sufficient to establish the existence of an element essential to his case and on which he will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "The burden on the moving party may be discharged by a 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Bergwall v. MGH Health Servs., Inc., 243 F. Supp. 2d 364, 369 (D. Md. 2002) (quoting Motor Club of America Ins. Co. v. Hanifi, 145 F.3d 170, 174 (4th Cir. 1998)). "Once the moving party has met this burden, the burden of production shifts to the nonmoving party who 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" Id. (quoting Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

"The nonmoving party 'may not rest upon the mere allegations or denials of the adverse party's pleading' (Fed. R. Civ. P. 56(e)), but must come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. (quoting Matsushita, 475 U.S. at 587). "A genuine

issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party." Id. Failure to demonstrate a genuine issue for trial will result in summary judgment. Strag v. Board of Trustees, 55 F.3d 943, 951 (4th Cir. 1995). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## III.  ARGUMENT

### A.  Standard for Bringing an EMTALA Claim.

Congress enacted EMTALA in 1986 "to address a growing concern with preventing 'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions were stabilized." Bergwall, 243 F. Supp. 2d at 370 (internal citation omitted); see Brooks v. Maryland Gen. Hosp., Inc., 996 F.2d 708, 710 (4th Cir. 1993). It is well-established that the cause of action EMTALA created is distinct and different in kind from a medical malpractice or negligence claim. See Bryan v. Rectors & Visitors of Univ. of Virginia, 95 F.3d 349, 351 (4th Cir. 1996) (EMTALA is "not a federal malpractice statute"). EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee a proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence. Vickers v. Nash Gen. Hosp., Inc., 78 F.3d 139, 142 (4th Cir. 1996) (quoting Power, 42 F.3d at 856); see also Baber v. Hosp. Corp. of Am., 977 F.2d 872, 880 (4th Cir. 1992) ("We reject [the] suggestion that failure to diagnose an emergency medical condition violates EMTALA.")

Rather than guaranteeing outcomes, EMTALA's purpose "was to require participating hospitals with emergency facilities 'to provide emergency care to all individuals who come

there' by 'determin[ing] whether or not an emergency condition exists' and then stabilizing that condition." Bergwall, 243 F. Supp. at 370.  "EMTALA's proscriptions thus focus on a hospital's disparate treatment of—or its total failure to treat—an individual in need of emergency medical care." Id. "'Congress deliberately left the establishment of malpractice liability to state law, limiting EMTALA's role to imposing on a hospital's emergency room the duty to screen all patients as any paying patient would be screened and to stabilize any emergency condition discovered.'" Id. (quoting Brooks, 996 F.2d at 711). "'Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery.'" Id. (quoting Baber v. Hosp. Corp. of America, 977 F.2d 872, 880 (4th Cir. 1992)). The Act "does not provide a cause of action for routine charges of misdiagnosis or malpractice." Vickers, 78 F.3d at 143.

Thus, EMTALA "imposes a 'limited duty on hospitals with emergency rooms to provide emergency care to all individuals who come there." Id. at 142. To meet this duty a hospital must provide an individual seeking treatment at its emergency room with "an appropriate medical screening examination within the capability of the hospital's emergency department ... to determine whether or not an emergency medical condition (within the meaning of [§ 1395dd(e)(1)] ) exists." Bergwall, 243 F. Supp. 2d at 370. "Once the hospital determines that the individual suffers from an emergency medical condition, the facility either must provide 'further medical examination and such treatment as may be required to stabilize the medical condition,' § 1395dd(b)(1)(A), or it must transfer 'the individual to another medical facility in accordance with [§ 1395dd(c)].'" Id.

**B.  The Complaint Fails To Allege Facts Showing A Plausible Claim To Relief Under EMTALA.**

1.  *The Complaint Fails To Allege Facts Stating A Plausible Claim For Improper Screening Under 42 USC § 1395dd(a).*

Because the focus of EMTALA is on disparate treatment, an individual asserting a claim for a failure to screen must allege facts showing that he or she did not receive an emergency room screening that the hospital would have provided to a patient that the hospital *perceived* to have the same medical condition as the plaintiff. See Vickers, 78 F.3d at 144 ("EMTALA is only implicated when individuals who are *perceived* to have the same medical condition receive disparate treatment; it is not implicated whenever individuals who turn out *in fact* to have had the same condition receive disparate treatment."); Id. at 145 ("Because appellant does not allege that Vickers received different treatment than other patients perceived to have the same medical condition, he fails to state a claim of inappropriate screening under EMTALA").  The focus of the cause of action is not on the adequacy of the screening in the sense of ensuring a correct diagnosis. Id. at 143 ("But the accuracy of the diagnosis is a question for state malpractice law, not EMTALA; the Act 'does not impose any duty on a hospital requiring that the screening result in a correct diagnosis.'") Such a claim would merely duplicate state malpractice law. Id. at 143-144.

Here, Plaintiff has not alleged any facts showing that he was screened in a different manner than other similarly situated patients presenting to FMH's emergency department with complaints of "sudden-onset back pain," "bilateral leg numbness" and "right leg spasms." (Compl. ¶¶ 16, 20.)  Plaintiff has not even alleged that he received disparate treatment while in the emergency department.  Rather Plaintiff alleges that the screening provided to him was not adequate to detect that he was experiencing a thoracic spinal surgical emergency.  Specifically, Plaintiff alleges that he needed imaging of his thoracic spine via MRI which was not performed,

and that he was discharged after admission to FMH without a proper diagnosis of his condition. (Compl. ¶¶ 54-55.) Conclusorily, Plaintiff alleges that FMH's alleged failure to provide a neurological consult prior to his inpatient admission to FMH and to obtain an MRI caused FMH to misdiagnose his emergency medical condition and thus not to stabilize his thoracic spinal injury. (Compl. ¶¶ 22, 34, 37, 54-57.)  This failure, Plaintiff alleges, lead to the progressive degeneration of his medical condition and to his ultimate paralysis on September 29, 2011, more than two months after his initial presentation to FMH's emergency department. (Compl. ¶¶ 56, 57, 37.)

These are allegations of negligent treatment and misdiagnosis, not allegations of a violation of EMTALA's requirement that a hospital "'apply uniform screening procedures to all individuals coming to the emergency room.'" Vickers, 78 F.3d at 143 (quoting Matter of Baby K, 16 F.3d 590, 595 (4th Cir. 1994)).  Although dressed up by conclusory legal assertions that FMH failed to provide an adequate screening, the factual allegations of the complaint assert nothing more than a state medical malpractice action premised on FMH's alleged failure to properly diagnose Mr. Johnson's thoracic spinal condition.  Plaintiffs do not even allege, much less assert the necessary facts, to make out a plausible claim that Mr. Johnson was screened differently than other similarly situated patients.

Most important, there can be no EMTALA claim for improper screening where an emergency condition is in fact detected (even if not the correct diagnosis) and the patient is admitted from the emergency department for inpatient treatment. Collins v. DePaul Hospital, 963 F.2d 303, 307, 307 n. 5 (10th Cir. 1992) (Stating that EMTALA does not require a hospital to identify *all* emergency medical conditions facing a patient presenting to emergency room and that hospital's identification of any emergency medical condition and admission for continued

treatment in and of itself defeats a claim under 42 U.S.C. § 1395dd(a) for improper screening); Benitez-Rodriguez v. Hospital Pavia Hato Rey, Inc., 588 F. Supp. 2d 210, 216 (D.P.R. 2008) ("Moreover, this Court believes that the logic used by the 11th Circuit in the *Harry* decision, stating that admission precludes a stabilization claim, should also apply to the screening process. It would border on the absurd to conclude that a hospital that has provided extensive emergency and inpatient care to an individual, failed to screen him or her as it would any other patient in his or her condition.") This is because EMTALA only requires that an appropriate screening be performed to determine that *an* emergency medical condition exists. Collins, 963 F.2d at 306-307 ("The stated reason in 42 U.S.C. § 1395dd(a) for requiring a participating hospital to provide an 'appropriate medical screening examination' of one suffering from injuries who presents himself at a hospital is to determine whether an 'emergency medical condition exists.' Nothing more, nothing less.")  If, after determining that an emergency medical condition exists, a patient is admitted from the emergency department to the hospital for further medical treatment the hospital has discharged its obligation under EMTALA to conduct an appropriate screening and there can be no liability on the part of the hospital for failure to screen. Collins, 963 F.2 at 307; Benitez-Rodriguez, 588 F. Spp. 2d at 216.  Again, EMTALA does not create a cause of action for improper diagnosis, or inadequate screening in the sense that a plaintiff's true condition was not detected. Collins, 963 F.2d at 307 ("42 U.S.C. § 1395dd(a) is not intended to 'ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances."); Vickers, 78 F.3d at 143.  Given that Plaintiffs have alleged that FMH admitted Mr. Johnson for further inpatient treatment, the Complaint fails to state a claim for improper screening under EMTALA.

      2. *The Complaint Fails To Allege Facts Stating A Plausible Claim For Failure To Stabilize Under 42 U.S.C. § 1395dd(b).*

Second, Plaintiffs have failed to allege facts showing that Mr. Johnson was not medically stabilized within the meaning of EMTALA at the time of his admission from the emergency department for inpatient treatment. "Stabilized" under EMTALA does not mean correctly diagnosed, nor does it mean fully treated. Gerber v. Northwest Hospital Center, Inc., 943 F. Supp. 571, 577 (D. Md. 1996) (EMTALA "takes the actual diagnosis as a given … [it] does not 'hold hospitals accountable for failing to stabilize conditions of which they were not aware, *or even conditions of which they should have been aware* … EMTALA would otherwise become coextensive with malpractice claims for negligent treatment.") (emphasis in original); Bergwall, 243 F. Supp. 2d at 374 ("Stabilizing a patient does not mean treating the patient's emergency medical condition in full … Stabilization is not measured against the correct diagnosis of the patient's condition"). Rather, "to stabilize" under EMTALA means, with respect to an emergency medical condition, "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely *to result from or occur during* the transfer of the individual from a facility…" 42 U.S.C. § 1395dd(e)(3)(A) (emphasis added). Whether a patient has been properly "stabilized" is based on "'the patient's condition at the time of the transfer or discharge.'" Bergwall, 243 F. Supp. 2d at 374-375 (quoting Nieves v. Hosp. Metropolitano, 998 F. Supp. 127, 133 (D.P.R. 1998)).

      Importantly, EMTALA's "stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that

treatment." Bryan, 95 F.3d at 352.  Thus a hospital's obligation to stabilize a patient's emergency condition ends upon admission to the hospital for inpatient care. Id.; Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002) ("We hold that EMTALA's stabilization requirement ends when an individual is admitted for inpatient care."); Benitez-Rodriguez, 588 F. Supp. 2d at 214 ("Various Circuits have determined that EMTALA's stabilization requirement is not applicable in situations where an individual is admitted to the hospital for further treatment.").

While Plaintiffs allege that Mr. Johnson was discharged by FMH following his inpatient admission without his thoracic spinal condition being properly diagnosed and stabilized they have failed to allege any facts showing that FMH's *emergency department staff* did not provide the necessary treatment to assure that Mr. Johnson would not suffer "a material deterioration" of his condition *as they understood it to be* prior to his admission for inpatient treatment, a higher level of care.  Plaintiffs have failed to allege any facts showing a plausible EMTALA claim, instead focusing on FMH's alleged failure to properly diagnose Mr. Johnson's alleged thoracic condition.  This is not the province of EMTALA, but of state malpractice law, if at all.

Even if this Court determines that the Complaint asserts sufficient facts to make out a plausible "stabilization" claim under EMTALA, this Court should enter summary judgment in FMH's favor because Mr. Johnson's emergency medical condition had in fact been stabilized at the time of his admission to FMH for inpatient treatment.  An "emergency medical condition" as defined by EMTALA means "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual … in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily

organ or part." 42 U.S.C. § 1395dd(e)(1)(A). As documented by Mr. Johnson's medical records, the emergency medical condition that FMH actually diagnosed had been stabilized at the time of Mr. Johnson's admission for inpatient treatment on July 16, 2011.

Mr. Johnson's medical records document that he presented to FMH's emergency room on July 15, 2011 at 11:03 p.m. "complaining of having severe low back pain since 8:30 a.m." (Ex. 1-A at 20, 24.) Mr. Johnson stated that he was "carrying heavy luggage and twisted his back around 8:30 and felt pain in his back with intensity about 9/10, and since then, the pain had gotten worse towards the end of the day, associated with bilateral leg numbness, which made him to [sic] come to the ER." (Id. at 24.) Mr. Johnson was admitted to FMH's medical surgery department by 2:33 a.m. on July 16, 2011 for "pain management" and "further management pending [a] hospital course." (Id. at 24, 26.)

The emergency department treatment record and admission order document that FMH's emergency department had diagnosed Mr. Johnson as suffering from: acute intractable lower back pain, bilateral lower extremity numbness, ambulatory dysfunction, hyperlipidemia, and obesity. (Id. at 20, 22, 25-26.) Mr. Johnson's patient history and physical examination obtained by his admitting physician, Dr. Nokku, establish that by the time of his admission to FMH for inpatient treatment, and as a result of care provided by the emergency department, Mr. Johnson was "pain free in his low back" and had no neurological deficits. (Id. at 25.) Further, Mr. Johnson was observed to be "moving all extremities," demonstrated "5/5" strength in all extremities, and exhibited no focal deficit. (Id.) Thus, at the time of his admission for inpatient treatment, Mr. Johnson's records establish that the emergency medical condition that FMH believed he was suffering from had in fact improved and had been stabilized and that Dr. Nokku

believed it was appropriate to admit Mr. Johnson to FMH for inpatient treatment, a higher level of care within the hospital.

As documented by Mr. Johnson's medical records, there was no risk that Mr. Johnson's emergency medical condition would materially deteriorate as a result of or during his transfer to a higher level of care within the hospital. Thus, if Count IV is not dismissed for failing to state a claim, this Court should enter summary judgment in FMH's favor as to Count IV because there is no dispute of material fact that Mr. Johnson's emergency medical condition had been "stabilized" within the meaning of EMTALA at the time of his admission to FMH for inpatient treatment.

### C. **This Court Should Decline To Exercise Supplemental Jurisdiction Over Plaintiffs' State Law Claims.**

The only basis for this Court's jurisdiction is the alleged EMTALA claim in Count IV. For the reasons stated above, Defendant is entitled to the dismissal or, in the alternative, entry of summary judgment in its favor on Count IV. Although it is within this Court's discretion, if it dismisses Count IV, to dismiss the remaining state law claims (see Carlsbad Tech., Inc. v. HIF Bio, Inc., 129 S. Ct. 1862, 1866 (2009) (citing 29 U.S.C § 1367(c)), it is well established that courts generally dismiss state law claims when the federal claims are dismissed, especially when the lawsuit is in its infancy. See Waybright v. Frederick County, 528 F.3d 199, 209 (4th Cir. 2008); Kendall v. City of Chesapeake, 174 F.3d 437, 444 (4th Cir. 1999); Flanagan v. Anne Arundel County, 593 F. Supp. 2d 803, 812 (D. Md. 2009).

In light of the fact that: (1) no discovery or other pretrial preparation has occurred since Plaintiffs filed this lawsuit in federal court; (2) this case has not progressed beyond the pleading stages; (3) the remaining state law claims will best be resolved by the Maryland state court and

the citizens of Frederick County, Maryland; and (4) Plaintiffs are free to re-file their state law claims, this Court should decline to exercise supplemental jurisdiction over Counts I, II and III.

## IV.   CONCLUSION

For all of the foregoing reasons, this Court should dismiss the Complaint, or enter summary judgment in favor of Defendant FMH as to Count IV, and decline to exercise supplementary jurisdiction over the related state law claims.  This matter, which clearly involves only state medical malpractice claims, should proceed in the Circuit Court for Frederick County.

WHEREFORE, Defendant Frederick Memorial Hospital, Inc. respectfully asks this Court to dismiss the Complaint, or, in the alternative, to enter summary judgment in its favor as to Count IV.

                                              */s/*
                                   J. Michael Sloneker (Bar No. 03324)
Ryan K. Bautz (Bar No. 27888)
ANDERSON, COE & KING, LLP
Seven Saint Paul Street, Suite 1600
Baltimore, Maryland 21202
T:  410-752-1630
F:  410-752-0085
sloneker@acklaw.com
bautz@acklaw.com
*Attorney for Defendant Frederick Memorial Hospital, Inc.*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of October, 2012, a copy of Defendant Frederick Memorial Hospital, Inc.'s Motion to Dismiss Or, In The Alternative, Motion for Summary Judgment, and Memorandum of Law in Support was served electronically to:

Catherine D. Bertram, Esquire
Jacqueline Colclough, Esquire
Regan Zambri Long
1919 M Street, NW, Suite 350
Washington, DC  20036
cbertram@reganfirm.com
jcolclough@reganfirm.com
*Attorneys for Plaintiffs*

Conrad W. Varner, Esquire
Varner & Goundry
121 East Patrick Street
Frederick, MD  21701
*Attorney for Defendants Ravi Yalamanchili, M.D.; Ravi Yalamanchili, M.D., P.A.; Boyd A. Dwyer, M.D.; and Mid Maryland Neurology, P.A.*

                                              /s/
                                    Ryan K. Bautz (Bar No. 27888)