IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
| CHARLES A. JOHNSON, et al., | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL NO.: WDQ-12-2312 |
| FREDERICK MEMORIAL HOSPITAL, INC., et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

Charles A. Johnson and Theresa Johnson (collectively, the "Plaintiffs") sued Frederick Memorial Hospital, Inc. ("FMH") and others[1] (collectively, the "Defendants"), for medical malpractice and other claims. Pending is FMH's motion to dismiss or, alternatively, for partial summary judgment.[2] No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2011). For the following reasons, the motion will be granted.

---

[1] The Plaintiffs also sued Ravi Yalamanchili, M.D.; Ravi Yalamanchili, M.D., P.A. ("RYPA"); Boyd A. Dwyer, M.D.; and Mid Maryland Neurology, P.A. ("MMN"). Compl.

[2] The motion will be treated as a motion to dismiss; the Court will consider the pleadings, matters of public record, and documents attached to the motion that are integral to the complaint and whose authenticity is not disputed. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

I.  Background[3]

The Plaintiffs are husband and wife. Compl. ¶¶ 7-9. On July 15, 2011, Charles Johnson--then 53 years old--arrived at FMH's emergency department complaining of sudden-onset back pain, bilateral leg numbness, and right leg spasms. Id. ¶¶ 15-16. Johnson "came under the care of" Doctor Albert Villarosa, id. ¶ 17, and was admitted to FMH the next day, id. ¶ 18. Doctor Ramani Nokki, an FMH employee, diagnosed bilateral lower extremity numbness, and recommended a neurosurgical consultation and MRI "'in the morning.'" Id. ¶ 18. Also on July 16, Johnson was seen by Yalamanchili, who diagnosed lumbago[4] and similarly recommended an MRI. Id. ¶ 19. The procedure was attempted but not completed that day, because Johnson's "intractable" back pain rendered him incapable of lying on the table. Id. ¶¶ 20, 54. The Defendants made "[n]o effort" to sedate or "stabilize" Johnson to obtain the imaging. Id. ¶ 20.

On July 17, 2011, Johnson was discharged from FMH, "despite his continued complaints of lower extremity weakness." Compl. ¶ 21. On August 1, 2011, Johnson underwent an MRI at Open MRI of

---

[3] For the motion to dismiss, the well-pled allegations in the complaint are accepted as true. *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011).

[4] "Lumbago" describes mid- and lower back pain. *Stedman's Medical Dictionary* 1121 (28th ed. 2006).

Frederick, which revealed a disc herniation[5] at T11-12, with a "mild mass effect" on his spinal cord. *Id.* ¶ 22. On August 2, 2011, Johnson "saw" Yalamanchili in his office. *Id.* ¶ 23. On August 6, 2011, Johnson underwent an MRI of the cervical spine[6] at Family MRI. *Id.* ¶ 24. On August 8, 2011, Johnson returned to Family MRI for an MRI of his thoracic spine.[7] *Id.* On August 12, 2011, Johnson visited Dwyer at MMN for a consultation. *Id.* ¶ 25. Johnson complained of lower extremity weakness with numbness and tingling. *Id.* Johnson also told Dwyer that he was taking "'round the clock'" muscle relaxants and pain medication, and required a walker to move. *Id.* Johnson returned to Dwyer on August 31, 2011, suffering from "progressive" lower extremity weakness that caused him to drag his leg after a day at work. *Id.* ¶ 26.

Shortly before 10:00 a.m. on September 27, 2011, Johnson began to experience "severe" bilateral lower extremity weakness, and called 911. Compl. ¶ 27. He was taken by ambulance to FMH. *Id.* Notwithstanding his "emergency neurological symptoms," Johnson waited more than three hours for an evaluation by

---

[5] "Disc herniation" is when disc material extends into the spinal canal. *Stedman's, supra,* at 881.

[6] I.e., the neck. *Stedman's, supra,* at 351.

[7] The "thorax" is the upper part of the trunk between the neck and abdomen; it contains the chief organs of the circulatory and respiratory systems. *Stedman's, supra,* at 1982.

3

emergency department Doctor Edward Thompson. *Id.* ¶ 28. In the interim, Johnson was neither told of the risk of the delay nor offered a transfer to another facility. *Id.* Thompson ordered an MRI of the lumbar spine[8] at 2:10 p.m., to "rule out" cord compression and *cauda equina* syndrome.[9] *Id.* At 3:30 p.m., Johnson was transported to FMH's Rosehill facility for the MRI. *Id.* ¶ 29. At 5:48 p.m., Johnson was returned to FMH's emergency department. *Id.* ¶ 30. By then, he was unable to move both legs. *Id.* Johnson was admitted to the hospital and transported to a room at about 7:00 p.m. *Id.* ¶ 31.[10] At about 11:00 p.m., Johnson was seen by neurologist Doctor Ernest Clevinger; Clevinger ordered an MRI of the thoracic spine, "to be done early the next day." *Id.* ¶ 32.

At about 7:30 a.m. on September 28, 2011, Yalamanchili examined Johnson and agreed with Clevinger's order for a thoracic MRI. Compl. ¶ 33. The MRI was not performed until 4:00 p.m. that day, 17 hours after it was ordered by Clevinger and more than 31 hours after Johnson had presented with

---

[8] "Lumbar" refers to the part of the back and sides between the ribs and pelvis. *Stedman's, supra,* at 1121.

[9] The "cauda equina" comprises the roots of all spinal nerves below the first lumbar. *Stedman's, supra,* at 328. *Cauda equina* syndrome describes the often-asymmetric "involvement" of the roots. *Stedman's, supra,* at 1892.

[10] It was "noted" that Johnson was retaining urine after his admission, "yet no urgent action [wa]s taken." Compl. ¶ 31.

4

complaints "consistent" with a "thoracic spinal surgical emergency." *Id.* ¶ 34. The MRI revealed Johnson's T10-11 disc was compressing the thoracic spinal cord. *Id.* Based on these results, Clevinger ordered that Johnson's blood thinning medication be held in preparation for surgery. *Id.* ¶ 35. The Plaintiffs requested Johnson to be transferred to a tertiary care hospital for the surgery, but Yalamanchili "persuaded" Johnson to let him operate at FMH. *Id.* ¶ 36. Yalamanchili performed the surgery--a thoracic laminectomy and right T10-11 discectomy[11]--on September 29, 2011. *Id.*

By the time the operation was completed, Johnson suffered from permanent lower extremity paralysis. Compl. ¶ 38. He was transferred to the University of Maryland Medical Center, where he was an inpatient with "severe complications" for almost three weeks. *Id.* Johnson was then transferred to Adventist Rehab Hospital, where he stayed for nearly two months. *Id.* According to the Plaintiffs, Johnson will require a "lifetime" of medical and other care. *Id.*

On or about June 19, 2012, the Plaintiffs filed a claim with the State of Maryland's Health Care Alternative Dispute Resolution ("ADR") Office. Compl. ¶ 3. On July 13, 2012, the Plaintiffs filed a first amended statement of claim, to which

---

[11] Both "laminectomy" and "discectomy" denote excisions. *Stedman's, supra*, at 550, 1046.

they appended a certificate of meritorious claim. *Id.* ¶ 4; *see also* Compl., Ex. 1. On July 13, 2012, the Plaintiffs waived arbitration and, on July 27, 2012, the Director of the Health Care ADR Office issued an order of transfer to "the United States District Court, or to the Circuit Court of the appropriate venue and jurisdiction." Compl. ¶ 5; *see also id.*, Ex. 2.

On August 6, 2012, the Plaintiffs filed suit. ECF No. 1.[12] On September 24, 2012, Dwyer, MMN, Yalamanchili, and RYPA answered. ECF No. 7. On October 3, 2012, FMH moved to dismiss or, alternatively, for summary judgment on Count Four. ECF No. 11. On October 31, 2012, the Plaintiffs opposed the motion. ECF No. 17. On November 20, 2012, FMH replied. ECF No. 22. On April 25, 2013, the parties requested a hearing. ECF No. 25.

II. Analysis

A. Legal Standard

Under Fed. R. Civ. P. 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6) tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of

---

[12] The complaint alleged four causes of action:
(1) Medical malpractice (Count One);
(2) Lack of informed consent (Count Two);
(3) Loss of consortium (Count Three); and
(4) Violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd (Count Four).
ECF No. 1.

6

a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001). Although Rule 8's notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003). These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

This requires that the plaintiff do more than "plead[] facts that are 'merely consistent with a defendant's liability'"; the facts pled must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). The complaint must not only allege but also "show" that the plaintiff is entitled to relief. *Id.* at 679 (internal quotation marks omitted). "Whe[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief." *Id.* (internal quotation marks and alteration omitted).

"The determination whether to dismiss with or without prejudice under Rule 12(b)(6) is within the discretion of the district court."[13] "[P]leading is [not] a game of skill in which one misstep by counsel may be decisive to the outcome . . . the purpose of pleading is to facilitate a proper decision on the merits." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (internal quotation marks omitted). When a plaintiff's complaint fails to state a claim, he "should generally be given a chance to amend the complaint . . . before the action is dismissed with prejudice."[14] But, dismissal with prejudice is proper if there is no set of facts the plaintiff could present to support his claim. *See, e.g., Cozzarelli v. Inspire Pharm., Inc.*, 549 F.3d 618, 630 (4th Cir. 2008).

B. EMTALA

EMTALA, commonly known as the "Patient Anti-Dumping Act," was enacted to prevent hospitals' suspected practice of "dumping" patients who were unable to pay for care, either by refusing to provide basic emergency treatment ("failure to screen") or by transferring patients to other hospitals before

---

[13] *180S, Inc. v. Gordini U.S.A., Inc.*, 602 F. Supp. 2d 635, 638-39 (D. Md. 2009) (citing *Carter v. Norfolk Cmty. Hosp. Ass'n*, 761 F.2d 970, 974 (4th Cir. 1985)).

[14] *FinServ Cas. Corp. v. Settlement Funding, LLC*, No. H-10-0264, 2010 WL 2757536, at *10 (S.D. Tex. July 13, 2010) (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)).

the patients' conditions were sufficiently stabilized ("failure to stabilize"). *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994); H.R. Rep. No. 99-241, pt. 1, at 27 (1985).

Commensurate with this goal, the Act imposes two principal obligations on hospitals. *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 142 (4th Cir. 1996). First, when a person seeks treatment at a hospital's emergency room, the hospital must provide "an appropriate medical screening examination" to determine whether an "emergency medical condition"[15] exists. 42 U.S.C. § 1395dd(a). Second, if the screening reveals the presence of an emergency medical condition, the hospital must either provide the medical examination and treatment necessary to "stabilize"[16] the condition, or transfer the person to another medical facility. *Id.* § 1395dd(b)(1). Except under rare circumstances, a person may not be transferred or discharged before his emergency medical condition has been stabilized. *Id.*

---

[15] "Emergency medical condition" is defined, in relevant part, as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . serious impairment to bodily functions, or . . . serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A).

[16] To "stabilize" means to "provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A).

§ 1395dd(c)(1).[17] EMTALA creates a private cause of action for "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section." *Id.* § 1395dd(d)(2)(A).[18]

Courts have construed EMTALA to impose "a *limited* duty on hospitals with emergency rooms to provide emergency care to all individuals who come there." *Brooks v. Md. Gen. Hosp., Inc.*, 996 F.2d 708, 714-15 (4th Cir. 1993) (emphasis added). Critically, EMTALA "is not intended to duplicate preexisting legal protections, but rather to create a new cause of action, generally unavailable under state tort law." *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991).[19] The Act's proscriptions apply solely to "a hospital's disparate treatment of--or its total failure to treat--an individual in

---

[17] Under § 1395dd(c)(1), a hospital may not transfer a person whose emergency medical condition has not been stabilized unless, for instance, a physician certifies that the benefits from treatment at the alternate facility outweigh the risks of transfer. *Id.* § 1395dd(c)(1)(A)(ii).

[18] A participating hospital is defined as a "hospital that has entered into a provider agreement under section 1395cc of this title." *Id.* § 1395dd(e)(2). FMH does not appear to dispute that it is within this definition.

[19] *See also id.* § 1395dd(f) (stating that EMTALA does not "preempt any State or local requirement, except to the extent that the requirement *directly conflicts* with the requirement of this section") (emphasis added)); *Power*, 42 F.3d at 856 (EMTALA "was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence").

need of emergency medical care." *Bergwall v. MGH Health Servs., Inc.*, 243 F. Supp. 2d 364, 370 (D. Md. 2002).

C. FMH's Motion to Dismiss

FMH argues that Count Four (the EMTALA claim) fails to state a claim, and the Court should decline to exercise supplemental jurisdiction over the remaining state law claims. ECF No. 11.

1. EMTALA (Count Four)

Count Four alleges that FMH violated EMTALA by (1) failing to provide Charles Johnson with "appropriate" medical screening, "including but not limited to an MRI and a "proper" neuro-surgical consult, and (2) "unsafely" discharging Johnson before he was diagnosed and stabilized, "without good faith." Compl. ¶¶ 52-55. FMH contends that the Plaintiffs have failed to state an EMTALA claim because they have not alleged that Charles Johnson received disparate treatment, or that FMH's emergency department had not stabilized Johnson's emergency medical condition by the time he was admitted for inpatient care. ECF No. 11 at 3, 4. According to FMH, the complaint alleges, "[a]t best," "a standard medical negligence claim arising under Maryland law concerning [the Defendants'] alleged failure to correctly and timely diagnose Mr. Johnson's thoracic spinal condition." *Id.* at 3.

a. Failure to Screen (§ 1395dd(a))[20]

"What gives rise to a viable EMTALA claim is where the patient is not screened, or if screened, that the screening differed markedly from that provided other patients." *Money v. Banner Health*, No. 3:11-cv-00800-LRH-WGC, 2012 WL 1190858, at *8 (D. Nev. Apr. 9, 2012).[21] A "medical screening examination is 'appropriate' if it is designed to identify *acute* and *severe* symptoms that alert the physician of the need for *immediate* medical attention to prevent serious bodily injury." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1257 (9th Cir. 1995)

---

[20] Count Four of the complaint is titled "EMTALA--Failure to Stabilize Charlie Johnson." See Compl. at 13. However, because Count Four also alleges failure to screen, Compl. ¶ 52, the Court will address both causes of action.

[21] *See also, e.g.*, *Buras v. Highland Cmty. Hosp.*, 432 F. App'x 311, 313 (5th Cir. 2011) (an "appropriate medical screening examination" is "a screening examination that the hospital would have offered to any other patient in a similar condition with similar symptoms"); *Correa v. Hosp. San. Fran.*, 69 F.3d 1184, 1192-93 (1st Cir. 1995) (stating that the "essence" of the duty to screen" is "that there be some screening procedure, and that it be administered even-handedly"); *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 879 (4th Cir. 1992) (explaining that EMTALA "requires a hospital to develop a screening procedure designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints" (footnote omitted)); *id.* at 881 ("[W]e hold that a hospital satisfies [EMTALA's screening requirement] if its standard screening procedure is applied uniformly to all patients in similar medical circumstances."); *Keitz v. Virginia*, No. 3:11-cv-00061, 2011 WL 4737080, at *4 (W.D. Va. Oct. 5, 2011) ("EMTALA's core purpose aims at averting disparate treatment."); *Jones v. Wake Cnty. Hosp. Sys., Inc.*, 786 F. Supp. 538, 544 (E.D.N.C. 1991) (EMTALA is "merely an entitlement to receive the same treatment that is accorded to others similarly situated").

(emphasis in original). Here, the Plaintiffs have vaguely alleged that Johnson arrived at FMH's emergency department at some time on July 15, 2011. Compl. ¶ 16. After his arrival, Johnson "came under the care of" Doctor Villarosa. *Id.* ¶ 17.[22] There are no facts to suggest that Villarosa's examination of Johnson was atypical or discriminatory in light of Johnson's perceived condition ("sudden-onset back pain," "bilateral leg numbness," and "right leg spasms"). *Id.* ¶ 16. *See generally id.* Because they have not alleged that FMH failed to screen Charles Johnson, or screened him differently from patients presenting like conditions, the Plaintiffs have failed to state a claim under § 1395dd(a).

    b. Failure to Stabilize (§ 1395dd(b)(1))

There are several limitations on a hospital's duty to stabilize an emergency department visitor. First, as mentioned above, the duty to stabilize attaches after the hospital "determines that the individual has an emergency medical condition." 42 U.S.C. § 1395dd(b)(1). "Thus, the plain language of the statute dictates a standard requiring actual knowledge of the emergency medical condition by the hospital

---

[22] The Plaintiffs do not allege when or how Johnson was evaluated. *See generally* Compl. Indeed, the complaint is devoid of any factual allegations about the treatment Johnson received between July 15 and his admission to the hospital on July 16. *Id.*

13

staff."[23] EMTALA "does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they *should have been aware*." Vickers, 78 F.3d at 145 (emphasis added).

More importantly, a hospital need not stabilize a patient who, although experiencing a medical emergency, has been admitted for treatment. Specifically, under 42 C.F.R. § 489.24(a), "[i]f the hospital admits the individual as an inpatient for further treatment, the hospital's obligation [to stabilize] ends." 42 C.F.R. § 489.24(a). Section 489.24(d)(2) further emphasizes that, "[i]f a hospital has screened an individual . . . and found the individual to have an emergency medical condition, *and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition*, the hospital has satisfied its special responsibilities . . . with respect to that individual" (emphasis added). As the foregoing regulation suggests, an alleged "ruse" admission might--but is unlikely to--establish an EMTALA claim:

---

[23] *Baber*, 977 F.2d at 883; *see also Eberhardt*, 62 F.3d at 1259 ("As the text of the statute clearly states, the hospital's duty to stabilize the patient does not arise until the hospital first detects an emergency medical condition."); *Brooks*, 996 F.2d at 711 ("EMTALA's role [is] imposing on a hospital's emergency room the duty to screen all patients as any paying patient would be screened and to stabilize any emergency condition *discovered*." (emphasis added)); *Alvarez v. Vera*, No. 04-1579 (HL), 2006 WL 2847376, at *6 (D.P.R. Oct. 2, 2006) ("A hospital must have had actual knowledge of the individual's unstabilized emergency condition if an EMTALA claim is to succeed.").

14

> [A] hospital cannot escape liability under EMTALA by ostensibly 'admitting' a patient, with no intention of treating the patient, and then discharging or transferring the patient without having met the stabilization requirement. In general, however, a hospital admits a patient to provide inpatient care. We will not assume that hospitals use the admission process as a subterfuge to circumvent the stabilization requirement of EMTALA. If a patient demonstrates in a particular case that inpatient admission was a ruse to avoid EMTALA's requirements, then liability under EMTALA may attach.

*Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1169 (9th Cir. 2002).

FMH concedes that its screening of Johnson revealed the presence of an emergency medical condition. ECF No. 11 at 3. However, there is no dispute that Johnson was admitted to FMH after the emergency screening. Compl. ¶ 18. Accordingly, Johnson's claim for failure to stabilize must fail unless the Plaintiffs have plausibly alleged that FMH admitted Johnson in bad faith: i.e., not for the purpose of stabilizing his perceived condition. *See* 42 C.F.R. § 489.24(d)(2). Seeking to trigger this exception, the Plaintiffs allege that Johnson "needed imaging of his thoracic spine via MRI" and such imaging "was not done for pre-textual reasons," "including" a statement that he was incapable of undertaking an MRI due to back pain. Compl. ¶ 54. The Plaintiffs emphasize that no pain medication was prescribed to facilitate the imaging, nor did Johnson receive the neurosurgical consult recommended by Nokku before

15

his discharge the next day. *Id.* The Plaintiffs conclude that the complaint alleges FMH "failed to stabilize" Johnson "in the immediate time period after admission," which "is certainly legally sufficient" to survive dismissal. ECF No. 17 at 12.[24]

The Court is not persuaded. According to the complaint, Johnson was examined by two doctors after his admission to FMH. *Id.* ¶¶ 18-19. In accordance with the doctors' recommendations, an MRI was attempted but--at Mr. Johnson's request--the procedure was terminated. *Id.* ¶ 20. Johnson remained in the hospital for an additional day before being discharged on July 17, 2011. *Id.* ¶ 21. Given the extensive medical attention received by Johnson during his time as an inpatient, the Plaintiffs have not plausibly alleged that Johnson's admission was a "ruse" to avoid EMTALA's requirements. *Bryant*, 289 F.3d at 1169; *see also Iqbal*, 556 U.S. at 678.

"Once . . . a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, the patient's care becomes the legal responsibility of the hospital and the treating physicians. And, the legal adequacy of that care is then governed not by EMTALA but by the state malpractice law that everyone agrees EMTALA was not intended to preempt." *Bryan*

---

[24] The Plaintiffs attached certain of Johnson's medical records to their opposition to FMH's motion. The Court will not rely on this evidence--which was not attached to the complaint--in considering the motion to dismiss. *See Philips*, 572 F.3d at 180.

16

v. *Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996). Upholding the Plaintiffs' claims of inadequate treatment after Johnson's admission would "eviscerate any distinction between EMTALA actions and state law actions for negligent mistreatment and misdiagnosis," "contravening Congress'[s] intention and this circuit's repeated admonition that EMTALA not be used as a surrogate for traditional state claims of medical malpractice." *Vicker*, 78 F.3d at 141. Because the Plaintiffs have failed to plausibly allege that FMH failed to screen or stabilize Johnson within the meaning of EMTALA, Count Four will be dismissed.

2. The Tort Claims (Counts One, Two, and Three)

Counts One through Three (medical malpractice, lack of informed consent, and loss of consortium) allege Maryland common law torts. Thus, those claims are not within federal question jurisdiction. The Plaintiffs do not allege diversity and there is no indication that the parties are diverse. *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011); see *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806); Compl. ¶¶ 7-8, 10-14; see also 28 U.S.C. § 1332(a). Jurisdiction over the remaining Maryland law claims requires supplemental jurisdiction. See 28 U.S.C. § 1367(a).

If a plaintiff "would ordinarily be expected to try [all of his claims] in one judicial proceeding," a federal court may

hear claims that supplement the claim that creates jurisdiction. *Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 145 F.3d 660, 662 (4th Cir. 1998) (internal quotation marks omitted); see 28 U.S.C. § 1367(a). But, a court may decline to exercise supplemental jurisdiction if, *inter alia*, it has dismissed all claims over which original jurisdiction existed. 28 U.S.C. § 1367(c)(3).[25] In deciding whether to exercise discretion to consider supplemental claims, courts generally consider "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). Ultimately, supplemental jurisdiction is "a doctrine of flexibility," intended to allow courts to "deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values." *Id.* (internal quotation marks omitted).

Having dismissed the sole federal claim in a case that is, at base, a standard medical malpractice suit, the Court will

---

[25] See also *Jones v. Ziegler*, 894 F. Supp. 880, 896 (D. Md. 1995) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal law claims are dismissed before trial . . . the state claims should be dismissed as well." (internal quotation marks omitted)).

decline to exercise its discretion to adjudicate the remaining state claims.[26]

III. Conclusion

For the reasons stated above, FMH's motion to dismiss will be granted.

_____5/14/13_____  
Date

_____/s/_____  
William D. Quarles, Jr.  
United States District Judge

---

[26] Of course, the Plaintiffs may file suit in an appropriate Maryland state court: the statutes of limitations on their claims have not run. See Md. Code Ann., Cts. & Jud. Proc. § 5-109(a). Even if the limitations periods had run, 28 U.S.C. § 1367(d) provides that, "[t]he period of limitations for any claim asserted under subsection (a) . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." Accord Md. Rule 2-101(b) ("[I]f an action is filed in a United States District Court or a court of another state within the period of limitations prescribed by Maryland law and that court enters an order of dismissal . . . because the court declines to exercise jurisdiction . . . an action filed in a circuit court within 30 days after the entry of the order of dismissal shall be treated as timely filed in this State.").